## ANTOINE SAMPSON *vs.* BENJAMIN PEASE.

### IN ADMIRALTY.    BEFORE ALLEN, C.J.

### AUGUST, 1867.

In a suit for damages by a sailor against his captain for flogging; the Court awards libellant $100.

Relative duties of master and crew, defined and considered.

### DECISION OF ALLEN, C.J.

This is a libel in personam filed by Antoine Sampson against Benjamin Pease, master of the schooner Blossom, to recover damages for ill-usage, namely, in tying him in the rigging and administering on his back fifty-eight blows or lashes with a rope, whereby, as he alleges, he suffered severely.

The libellant admits the general allegation of the flogging, and justifies, on account of the improper, insolent, and mutinous conduct of the libellant.

The libellant shipped in Honolulu in February last, as cook and steward on board the Blossom for a voyage to the southern and western islands, touching at the Island of Ascension and such other places as the Captain might order, and thence to return to this port, where the schooner arrived in July last.

It appears in evidence on the part of the libellant, that while the schooner was at anchor at Ascension, the master returned from the shore one evening, and called the libellant and said to him that "he was going to put him in the rigging in the morning, because he had been sleeping with a woman," or as one of the witnesses testifies, "his woman." It is in evidence that he did so, and that he struck him more than fifty blows; he would administer a few blows, then desist, and then apply more, till libellant said he would go back to his duty. The witnesses called by libellant testify that he was very much cut and bruised in the back by the rope, which was exhibited in Court, and which was a 2-inch rope; they say further that the libellant denied having any intercourse with the woman, and there is no evidence which sustains that charge.

It appears in evidence on the part of the libellant that on the day before the flogging, the mate ordered him to go below and get some bread for the men, and he refused to do so because it was not his duty, whereupon a dispute arose, and abusive language was used by libellant. He did get the bread, however. It is also in evidence that the mate and libellant were intoxicated. The mate testifies that he was insolent to him at the time of the occurrence, and picked up an axe, but put it down when he told him to do so; he was pretty well intoxicated. He says further that the men complained of want of provisions. At the time the captain and mate seized him to put him in the rigging, he was in the galley; took up a sheath-knife, made a motion, and laid it down. He called upon the men to help him, but none came. After the flogging he got breakfast, and lost no

time by reason of the chastisement, since which he has behaved very well.

There is some conflict of evidence in relation to the size of the rope, but one of the witnesses testifies positively that the 2-inch rope which was produced in Court was the identical rope.

Mr. Benson testifies that he saw the libellant worse for liquor several times, and that he asked him for liquor but he refused to give it to him. He was, on the occasion of the order given for the bread, insolent to the mate, although he eventually got the bread. ' He saw the flogging, and he says the lower part of the back was swollen, but he saw no cuts or blood.

It appears that a chief, with some women and children, came on board, and one of the witnesses testifies that the chief complained about libellant interfering with single women. Mr. Benson testifies that both the mate and libellant were intoxicated on the day of dispute about the bread. There is also evidence tending to show that interference with these women would promote dissatisfaction among the natives, and render the vessel insecure. It is in evidence also that there were prostitutes on board.

The principles of law applicable to master and seamen are very clearly defined. The master has the sole and exclusive command on board the vessel, and all those who have shipped are under obligation to obey his lawful commands. He has a legal right to chastise a seaman for disorderly and disobedient conduct, but it must be done in a reasonable manner, and very plainly appear by the evidence that it is merited, and that it is inflicted with due moderation.

The counsel for the libellant contends that no punishment can be lawfully inflicted when the master does not witness the act complained of, unless upon inquiry of those who knew the facts, and an opportunity is offered the person charged to defend himself. This is undoubtedly a sound legal proposition, and just and proper in itself. [Conkling's Admiralty, 219.]

It is in evidence that the master had the opinion and advice of others on board in relation to the conduct of the libellant, but

he gave no opportunity for defence. His denial of the charge did not make the master pause in his determination to punish him. He was entitled to be heard.

It is contended by the counsel for the libellant that "a seaman is not bound to obey an unlawful command, and may resist with what force is necessary." But upon examination it will be found that neither by the ancient or modern maritime codes has it ever been allowed seamen to interpose by force, unless it is to prevent the officers in command from committing flagrant crimes in their presence or through their agency, such as piracy or felony, or unless in case of a ship which is unseaworthy when she enters upon the voyage. In such cases the seamen have a right to refuse duty to continue the voyage, and they may compel the master to return to port. But this must be a very clear case. In cases of doubt, the opinion of the master and officers is much more worthy of confidence than the crew. Seamen do not ship to put their lives to any extraordinary hazard. It is part of the contract that the vessel is seaworthy, and if they are seduced to go in one that is not, they may refuse obedience. *United States vs. Ashton,* 2 Sumner, 17; *The Moslem,* Olcott, 297. Judge Story in the case of *United States vs. Cassidy,* 2 Sumner, 582, says: "If a person substituted as master be grossly incompetent to the duties of his station from want of skill, or bad habits, or profligacy, or cruel behavior, the seamen may be justified in refusing to do duty, or to remain by the ship." The doctrine applies to extreme cases, and to carry it farther would jeopardise the command, as well as the discipline of the ship.

The libellant had shipped to perform certain duties which are very well known among mariners, and when he was ordered by the mate to bring the bread, it was his duty to have done so, and he had no right to disobey the order. But it seems by the evidence that he relented and obeyed. This incident would present a different appearance if the mate had regarded the law, which it was his duty to do, or if the libellant had not ultimately obeyed. Men entrusted with command must first learn to govern their appetites and passions, and in its exercise they can appeal with

confidence to the laws for protection and aid. It is contended further by the counsel for the libellant, that the mate said he would not report this offence to the master, and that this is full condonation. But the Court is of opinion that the mate has not the power to pardon offences committed on board, even in the absence of the master, so that it would be a lawful defence should the master deem the delinquent worthy of being held to answer for such acts. The Admiralty regard seamen as wards, and it is upon the necessity of adopting this principle that they are not entrusted with power where any especial prudence or discretion is required. It must be an extreme case that a seaman would be justified in resisting the master with force.

Any other doctrine would be dangerous to the police of the sea. As Judge Ware says, in the case of *Carlton vs. Davis*, Davies Reports, 226, "The duty of a seamen in such case, is to submit to wrong. The nature of the master's authority, which is *quasi* parental authority, and the necessities of the service, imperiously require it. On his return to port he may appeal to the law for redress, and the master will be held to strict responsibility for any abuse of his authority."

With this extraordinary power with which the master is invested, he is held to responsibilities corresponding with it. It is his duty so to conduct the police of the ship as to cause no unnecessary tendencies to disorder. Before he should complain of his men for intoxication, he should see that his officers are free from it. On the day on which it is alleged that the libellant refused to go for bread, it is proved by the witnesses for both parties that the mate was intoxicated so much that he went into the cabin and slept till the master returned at evening. Such examples should not be placed before the men, and if they are, the responsibility must rest where it rightfully belongs; and the consequences to the order of the ship, and the discipline of the crew, are with the master and officers. It is in evidence that the liquor was kept in a demijohn, in a berth in the cabin; that the mate had access to it, and that as the libellant was intoxicated, it is a reasonable inference that he took it without leave.

It was a neglect of duty on the part of the master to permit liquor to be placed where it could be reached by the men. For this act of insubordination I hold the master and his mate mainly responsible; the former for permitting the liquor to be exposed to the libellant, and the latter as giving his example of intoxication. The mate was not capable of command on this occasion, and it is usual that a person under the influence of liquor is unreasonable, often insolent in his language, and unjust in his requirements.

In addition, the master in permitting lewd women to be on board violated the laws of good discipline as well as of good morals. He could not have resorted to a more certain cause of disturbance.

It becomes a master, before he justifies punishment as necessary to the discipline of the ship, to see that his own discharge of duty is promotive of this most essential object. If he permits intemperance in his officers on duty, it is to be expected that the seamen will imitate their example. The Court do not justify the seamen, but at the same time it is a palliation to insubordinate conduct. If the master permits lewd women on board, he violates the law of discipline in the first instance, and he cannot expect his crew will do better. Before a master can justify successfully, he must not only have discharged his duty properly, but he must not have permitted acts and doings on board calculated to influence the crew to disorderly conduct. In view of all the evidence of the case, I am of opinion that the libellant is entitled to damages. He does not, however, come into Court without fault, for it is in proof that he followed the example of the mate and became intoxicated, and as usual under the excitement which liquor necessarily causes, he was insubordinate; were it otherwise, I should award him larger damages than I propose to do. But under the circumstances, even if he was worthy of punishment, it was clearly excessive. I think he is entitled to $100 damages and costs.

*Andrew J. Lawrence,* proctor for libellant.

*A. F. Judd & W. C. Jones,* proctors for respondent.

Honolulu, August 20, 1867.